UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BLOC DISPENSARY LLC, <br> a New Jersey limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> TIMOTHY BOSSIDY, an individual, <br><br> Defendant. | No:_____ <br><br> JURY TRIAL DEMANDED |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

NOW COMES Plaintiff, Bloc Dispensary LLC ("Justice Grown"), by and through its undersigned attorneys, and complaining of Defendant Timothy Bossidy ("Bossidy"), alleges as follows:

### BACKGROUND

1. This action arises from Defendant Bossidy's breach of fiduciary duties that he owes to the Plaintiff, Justice Grown. Justice Grown is a cannabis company maintaining a large cultivation and manufacturing facility and three retail dispensaries in New Jersey. Together, Justice Grown's operations provide over one hundred jobs here. Bossidy is the Chief Restructuring Officer (CRO) for Justice Grown.

2. Bossidy was installed as CRO by Justice Grown's lender, AFC Gamma, Inc. (collectively with affiliated entities and agents "AFC Gamma") as part of a forbearance agreement between AFC Gamma and Justice Grown. He entered that role approximately one year ago at AFC Gamma's insistence that Justice Grown accept a CRO controller and that Bossidy be that CRO. As

the CRO, Bossidy has complete control of Justice Grown's New Jersey operations, similarly to a CEO.

3. Even though Bossidy has AFC Gamma to thank for his CRO role, Bossidy owes his fiduciary duties to Justice Grown and not at all to its lender. The law on this point is exceedingly clear and well-known to anyone in Bossidy's role.

4. Over the course of the year since AFC Gamma installed Bossidy he has done a disastrous job. For example, Justice Grown's cultivation sales are down by more than 50%, and the inventory backlog has increased five-fold. Justice Grown employees have repeatedly complained to AFC Gamma about these and other injuries that Bossidy was inflicting on the company, but AFC Gamma has insisted that Bossidy remain in a place and that Justice Grown do nothing to interfere with his decisions even as the damages from his mismanagement have piled up.

5. AFC Gamma's reaction has been surprising, since a good faith lender should want the company to succeed and therefore rid it of barriers to success such as Mr. Bossidy's mismanagement. Though counterintuitive for a good faith lender, AFC Gamma's conduct makes sense in the light of additional, concerning facts that Justice Grown only recently learned about Bossidy and his history with AFC Gamma and others, and which are discussed later in this complaint.

6. AFC Gamma's patronage towards Bossidy has been evident from the very beginning in that AFC Gamma insisted on Bossidy for CRO, refused a process to find additional candidates, and made clear that it would not enter into a forbearance unless Bossidy in specific received the CRO position. The close relationship between Bossidy and AFC Gamma is also evident from the fact that Bossidy routinely consults with AFC Gamma's CEO at least once a week and has direct communications with AFC Gamma relating to his management of Justice Grown.

7. In this manner, Bossidy controls Justice Grown and AFC Gamma controls both Justice Grown and Bossidy. Importantly, this level of control by a lender can subject it to lender liability and other claims brought by or on behalf of the borrower.

8. In contrast with his constant coordination with AFC Gamma, in the approximately one year since Bossidy became CRO he never even reached out to the owners of Justice Grown, until a week ago after the present dispute erupted and he initiated communications for reasons discussed below.

9. AFC Gamma recently launched a legal attack on Justice Grown, the first move in an apparent attempt to take its assets. Specifically, a few weeks ago, AFC Gamma claimed, quite falsely, that Justice Grown defaulted on its loan, which is a predicate to seizing its New Jersey cultivation/manufacturing facility and stores. It also demanded that Justice Grown's owners personally make an immediate payment of $30 million, also without basis.

10. At the heart of AFC Gamma's claim that Justice Grown has defaulted on its loan is that Justice Grown supposedly controls its operations in New Jersey, when in fact Bossidy and AFC Gamma are the ones in control and have been destroying it with mismanagement.

11. Justice Grown is now scrambling to prepare its defense and counterclaims (which include lender liability and other theories discussed below), and Bossidy possesses vital evidence it needs: the records showing AFC Gamma managing Justice Grown through him, being his written communications directly with AFC Gamma (emails, texts and the like) and other records demonstrating oral communications like phone logs. These communications are vital evidence showing AFC Gamma's routine involvement in the control of Justice Grown's New Jersey assets.

12. The dispute with AFC Gamma risks "bet the company" litigation for both sides: if AFC Gamma wins, it could take over all of Justice Grown's assets, while if Justice Grown wins, its claims based on AFC Gamma's mismanagement of its New Jersey assets and related misconduct

through Bossidy are large enough to wipe out AFC Gamma. Bossidy's loyalty in this dispute is therefore very much of concern.

13. Despite his clear legal duty of loyalty to Justice Grown, Bossidy has aligned himself with his patron, AFC Gamma, in the recent dispute. As explained below, he has engaged in improper and tortious behavior and breaching his fiduciary duty of disclosure to the company.

14. Both the duty of loyalty and the duty of disclosure plainly require that he share at least the same information with the company, of whom he is a C-level officer, that he has already shared with AFC Gamma, the lender that has made itself an adversary, to whom he has no fiduciary duty at all.

15. Justice Grown therefore demanded that Bossidy turn over Justice Grown's information to Justice Grown, particularly given that he has already shared it with AFC Gamma. Bossidy has not done so and has not performed the other requests.

16. Plaintiff thus brings this action to enforce Bossidy's fiduciary duties to obtain the documents needed in its dispute with AFC Gamma and to enjoin him from further committing disloyalty to the company.

## PARTIES

17. Plaintiff is a limited liability company organized under the laws of New Jersey with its principal place of business in Ewing, New Jersey.

18. Defendant Bossidy is a citizen and resident of Florida.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000. Plaintiff alleges that Bossidy, acting alone or in concert with AFC Gamma, has caused damages to Plaintiff in excess of $170 million. Bossidy's refusal to turn over the documents

of his communications with AFC Gamma is also hampering Justice Grown's ability to defend itself in its dispute with AFC Gamma where AFC Gamma is threatening to take Justice Grown's assets and claiming Justice Grown's owners must pay it as much as $30 million in cash.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in New Jersey. Mr. Bossidy is the CRO for Justice Grown's New Jersey operations, meaning that the deleterious effects of his poor management manifest here and the deleterious effects of his disloyalty manifest here, and he has also physically performed services related to this dispute at Justice Grown's facilities in Ewing, New Jersey.

## ADDITIONAL FACTS

21. AFC Gamma is a lender to Justice Grown that has taken control over its New Jersey operations.

22. Among other matters, AFC Gamma required Justice Grown to appoint Defendant Bossidy as CRO. AFC Gamma has also insisted that Defendant Bossidy remain in place even as evidence of severe mismanagement has mounted. For example, since AFC Gamma installed Mr. Bossidy, cultivation sales have dropped by roughly 50 percent and the backlog of inventory has increased five-fold.

23. This backlog of accumulated inventory represents approximately 10 month's worth of sales at the rates Bossidy's management has imposed.

24. Bossidy's logjam is choking the company, vastly diminishing the revenues it can earn. It is an obviously unsustainable situation, which AFC Gamma refuses to allow Justice Grown to rescue.

25. Bossidy's leadership and decisions are crippling operations so badly that it is hard to see that he is not doing this on purpose. He eliminated the production jobs from product packaging

as a supposed cost-saving measure. However, as he knew, these positions are vital to the manufacturing process and without these employees, Justice Grown has much less product ready to sell even while its costs to grow and process cannabis remain constant. In other words, Bossidy has forced Justice Grown to keep incurring its almost full complement of expenses while choking off its access to revenues.

26. These factory jobs were not particularly expensive for Justice Grown to maintain, and the expense pales in comparison to the revenues lost by eliminating them. These are manufacturing jobs -- which are important not only to the workers and the company, but also to the economically-disadvantaged community where Justice Grown operates – cutting them saved perhaps $15,000 per month.

27. Meanwhile, Bossidy hired four out-of-town friends as high-paid advisors and consultants. These four bill the company some $60,000 per month.

28. Defendant Bossidy's catastrophic mismanagement has not just harmed the operation of the cultivation facility but has also interfered in the ability of Justice Grown's dispensary retail staff to perform their jobs. For example, he cut popular product lines, (also called SKUs) from cultivation operations and refusing to allow the dispensaries to purchase products from suppliers who do not buy from Justice Grown's cultivation. The result is that Justice Grown's dispensaries have lost customers and sales volume to competitors who are willing to supply the products they want.

29. There is also a long, long string of other mismanagement by which Bossidy has alienated vendors (for example, he insists on delaying payments to New Jersey vendors in order to increase payments to AFC Gamma), demoralized employees and otherwise disadvantaged the business.

30. Despite Justice Grown raising these and many other concerns with AFC Gamma's CEO, AFC Gamma has refused to replace Bossidy and has insisted that Justice Grown allow him to continue his disastrous mismanagement on threat of being held in default.

31. The performance of the Justice Grown's New Jersey operations under Bossidy stands in sharp contrast to successes by many of the same Justice Grown team members in other states where Justice Grown's affiliates operate and which are outside of AFC's and Bossidy's control.

A dispute arises with AFC Gamma

32. In February of 2025, AFC Gamma, which had been kept apprised of the problems Bossidy is causing by Justice Grown staff, suddenly claimed that Justice Grown was in default on its loan and demanded $30 million. The move was bizarre: Justice Grown was not in default and there was no apparent justification for the sudden attack.

33. So, to defend itself, Justice Grown undertook an investigation to understand AFC Gamma's motivations. As a result, Justice Grown discovered additional information about AFC Gamma and Defendant Bossidy.

34. First, AFC Gamma was contemplating the formation of a multi-state cannabis operator (MSO) to include assets taken from its borrowers at or around the time Justice Grown and AFC Gamma entered into the forbearance agreement to settle their differences. Justice Grown is one of AFC Gamma's largest borrowers, if not the largest, and its loan is secured by assets in both New Jersey and Pennsylvania (belonging to Justice Grown's Pennsylvania affiliates), meaning that AFC can obtain two important states for a multi-state company by mismanaging Justice Grown's operations.

35. AFC Gamma's CEO, Dan Neville, was discussing the MSO idea with others, unbeknownst to Justice Grown, *at or around the same time that AFC Gamma insisted on installing Bossidy at Justice Grown.*

36. Second, Bossidy had a similar position at Med Men, a cannabis company that was experiencing financial difficulties and which has since collapsed. While in charge of Med Men, Bossidy made a deal to deliver very valuable assets that Med Men owned in New York to a company where Dan Neville was also an officer. Bossidy suddenly resigned from Med Men and the new leadership thereafter cancelled Bossidy's New York deal, presumably because it was unfair to Med Men. Neville was critical of Med Men cancelling Bossidy's deal.

37. Third, Bossidy has been accused of mismanaging other cannabis companies prior to AFC Gamma installing him at Justice Grown. The allegations involving a company called Greenrose are that Greenrose's then CEO was offered a bribe to let the company's lender take its assets, which included the largest cannabis facility in Connecticut. When the CEO refused, he was fired and replaced by Mr. Bossidy.

38. Fourth, according to allegations in Greenrose, Mr. Bossidy mismanaged the Connecticut asset, allowing the lender to then foreclose upon it.

39. Fifth, much of Bossidy's mismanagement makes sense if AFC Gamma was planning to seize Justice Grown's assets for an MSO. For example, if AFC Gamma seizes the New Jersey operations it would inherit not only the cultivation/manufacturing facility and stores, but also the massive backlog of cannabis inventory that Mr. Bossidy has built up on Justice Grown's dime, which is just waiting to be packaged. The new MSO could then quickly earn large revenues by re-hiring the inexpensive packaging jobs and sending the cannabis out as finished product.

40. Similarly, by choking off Justice Grown's ability to sell this product, Bossidy impairs its balance sheet, threatening its financial wherewithal to refinance its loans with another lender and

thereby get away from AFC Gamma. His actions therefore, help AFC Gamma to trap Justice Grown and to eventually take its assets.

41. Put simply AFC Gamma's insistence on putting in Bossify and coercing Justice Grown to follow Bossidy's disastrous instructions do not make business sense from the standpoint of a good faith lender, but they make perfect sense from the standpoint of a would-be competitor who has infiltrated Justice Grown and wants to take Justice Grown's New Jersey assets.

42. Justice Grown responded to AFC Gamma's threats by laying out the facts surrounding Bossidy's mismanagement, AFC Gamma's liability for the damages Bossidy was causing as a result of it control of the New Jersey assets through Mr. Bossidy, and a calculation of damages of $170.9 million, before potential trebling and punitive damages.

<u>Bossidy withholds information from Justice Grown</u>

43. Against this background of the dispute between AFC Gamma and Justice Grown, Defendant Bossidy is behaving suspiciously and is acting with disloyalty towards Justice Grown.

44. By way of example, Justice Grown had sent its response to AFC Gamma's threats on February 26, 2025, and sent litigation hold letters to both AFC Gamma and Bossidy shortly thereafter. Several days later, on or about March 3, 2025, Bossidy wrote an email to Justice Grown's owners with a proposed budget for 2025 stating that Justice Grown would need to have a meeting with AFC Gamma about it imminently under the terms of the Credit Agreement with AFC Gamma.

45. This was the first time Bossidy had ever reached out to Justice Grown's owners during his entire tenure, despite at least titularly working for them for nearly a year. This first-ever communication came only after Justice Grown sent a litigation hold letter to Mr. Bossidy, informing him of possible litigation between Justice Grown and AFC Gamma based on his mismanagement of the company.

46. The Credit Agreement provision of which Bossidy spoke is only triggered when AFC Gamma itself requests such a meeting. Not only had AFC Gamma never exercised that provision over the approximately four years of the Credit Agreement, Justice Grown had not received any communication from AFC Gamma exercising it this year.

47. Accordingly, Justice Grown's owners replied to Bossidy's email, and instructed him to tell them who had requested the meeting and to forward a copy of the email requesting it.

48. Complying with that directive would have taken Bossidy no more than a minute.

49. Instead, Bossidy ignored the owners' directive. He certainly received the instruction as he was on email with other Justice Grown employees throughout the same day, after it was sent.

50. Accordingly, the owners wrote Bossidy again to tell him that he must send the information by 10 a.m. the following day. See "ASAP Items on your plate" email, attached to this Complaint as Exhibit 1 and incorporated herein.

51. At 10:00 a.m., Bossidy wrote back, claiming that the owners had given him "unreasonable timelines" for the one-minute task of forwarding an email and did not produce the information. Id. He said he was going to get a lawyer.

52. The owners also requested that Bossidy provide a list of accounts that he has used to communicate with Justice Grown's lender. See Exhibit 1. While Justice Grown owns and has a legal right to possess Bossidy's emails through his Justice Grown email account, it does not control the other outside accounts he used to communicate with AFC Gamma, including, for example, any personal email accounts, corporate email accounts with SierraConstellation Partners (the corporation through which he provides his services), texts, etc. Accordingly, Bossidy was asked merely to list those accounts so that Justice Grown could take measures to have those entities preserve the records.

53. Providing that list should have taken only a few minutes. Nevertheless, Bossidy also claimed "unreasonable timelines" for preparing the list and did not provide the information.

54. Bossidy could have obeyed both requests in far less time than he spent trying to avoid them.

55. Justice Grown's owners subsequently agreed to communicate with Bossidy (its own CRO) through an attorney and has now demanded that he turn over all of his communications with AFC Gamma and provide phone logs of his verbal communications.

56. Justice Grown has a present and immediate right to Bossidy's loyalty and to the information that he shared with AFC Gamma. Instead of being loyal, Bossidy is trying to figure out if and how he can mount a legal fight against Justice Grown receiving the documents he gave AFC Gamma.

57. His conduct is highly suspicious, particularly in light of the new information about Bossidy's history, AFC Gamma's MSO plan, and his conduct and apparent allegiance to AFC Gamma is impairing Justice Grown's ability to defend itself against AFC Gamma's offensive maneuvers and prosecute its own claims against AFC Gamma.

58. Bossidy is acting in the best interests of AFC Gamma and not of Justice Grown.

59. Justice Grown has suffered at least $170.9 million in damages due to AFC Gamma's and Bossidy's mismanagement, including lost enterprise value, lost profits, wasted payments to Bossidy's "consultant" friends, and cascading losses to other operations.

60. Bossidy's string of inexplicably poor management decisions, his behavior towards the owners and their request for a simple few-minute task, together with his building up a massive asset of cannabis inventory that AFC Gamma could seize, presents a strong inference that he is and long has been actively working against Justice Grown's best interests.

61. Justice Grown has been attempting to work in the best interests of the company, which is to maximize the value of the company's assets. Although Mr. Bossidy is making it difficult, Justice Grown continues to try to work with Bossidy towards that end.

62. It is incumbent upon Bossidy to perform duties and do his job consistent with all of his fiduciary obligations to the company of which he is an officer, Justice Grown. His failure to do so is causing ongoing harm.

## COUNT I – BREACH OF FIDUCIARY DUTY

63. Plaintiff incorporates all paragraphs of this complaint as if fully set forth herein.

64. As CRO, Defendant Bossidy owes fiduciary duties to Justice Grown, including the duty of loyalty and duty of candor.

65. Bossidy is breaching his fiduciary duties by withholding critical business communications, actively mismanaging the company, building up a massive cannabis inventory instead of selling it (apparently to illegitimately benefit AFC Gamma and Justice Grown's expense), driving away employees, and failing to act in Justice Grown's best interests.

66. As a direct and proximate result of Bossidy's breaches, Justice Grown has suffered and continues to suffer injuries including actual damages and irreparable harm.

67. Justice Grown is entitled to injunctive relief and damages.

## COUNT II – CONVERSION

68. Plaintiff incorporates all paragraphs of this complaint as if fully set forth herein.

69. The communications between Bossidy and AFC are company property, and Bossidy has wrongfully withheld them from Justice Grown.

70. Bossidy's refusal to turn over these communications constitutes conversion of JC's corporate records.

71. Justice Grown is entitled to the immediate turnover of these records.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Order Defendant to produce all communications he has had with AFC Gamma, regardless of how stored, as well as records of his un-stored communications (e.g. call logs);

B. Require Defendant to include or copy at least one representative of Justice Grown in all of his communications with AFC Gamma going forward;

C. Issue a preliminary and permanent injunction prohibiting Defendant from further withholding corporate records;

D. Issue a preliminary and permanent injunction prohibiting Defendant from continuing to build up the inventory of cannabis instead of taking measures to sell it, and from further violation his duty of loyalty to Justice Grown;

E. Award Plaintiff compensatory and punitive damages in an amount to be determined at trial;

F. Award Plaintiff the costs and reasonable attorneys' fees incurred in this action; and

G. Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: March 7, 2025

LITT LAW, LLC

By: Matthew R. Litt, Esq.
789 Farnsworth Avenue
Bordentown, New Jersey 08505
Phone: (908) 902-7071
MLitt@LittLaw.Net

# EXHIBIT 1

# LOEVY + LOEVY

Michael Kanovitz <mike@loevy.com>

## ASAP items on your plate

**Michael Kanovitz** <mike@loevy.com>  
To: Tim Bossidy <tbossidy@justicecannabisco.com>  
Cc: Jon Loevy <jon@loevy.com>

Tue, Mar 4, 2025 at 12:17 PM

Tim,

Don't be absurd.
I did not give you any "unreasonable timelines."
I asked you to do two tasks:
1. Tell me who asked for the lender meeting and forward me the correspondence.
2. List the accounts that you use to communicate with AFC.
You could have completed it easily in 15 minutes—far less time than you have spent dragging your feet and fighting me on it.

Frankly, you are acting like a person with something to hide.
I find it disturbing that you won't share with the company the same communications you have given to AFC.
You have a fiduciary duty to the company, and that duty includes providing the company the same documents and information you have provided to the lenders.
Your refusal to spend 15 minutes giving me the information I asked for is hurting my ability to help the company.

If you want to communicate with me through a lawyer, then that is what you'll do.
Please tell me the lawyer's name and number so that I can reach out to them about obtaining the documents and information you are responsible to provide.
I have to assume that SCP has an in-house attorney that I can work with today to get the documents.

If not, then please tell me how soon you will be able to connect me with your attorney.
As I said, getting this information is a vital priority, and not having the information is hurting the company in its dealings with AFC.
I am trying to help the company and for planning purposes I need to know how long you think it will take before you have an attorney I can talk to.
Please let me know your estimate by COB.

The rest of my response to your email appears in red font following your paragraphs below.

Mike

> Given your refusal to meet with me to discuss the situation and the allegations that you appear to have asserted against me in your preservation letter, dated 2/28/25, I will need to seek the advice of independent legal counsel before I respond to your requests, for which the purpose is unclear and which have been made on an unreasonable timeline.

Your position makes no sense whatsoever. *You initiated contact* with me *after* you received the 2/28/25 letter. That letter (four pages, single spaced) laid out the legal claims thoroughly and our concerns that you may be in cahoots with the lender. If you felt that the 2/28/25 letter docuured you to speak with me through attorneys you would have gotten one before initiating contact. If you felt you needed more information, you could have emailed to request it.

It feels like you are playing games. In the year that you've been CRO, the first and only time you ever reached out to me or Jon about the company was *yesterday*. Now, 24 hours later, you are saying that you won't respond without an attorney.

You are not only refusing to spend 15 minutes to provide documents and information that belong to the company, *you won't even tell me what else you supposedly need to know before doing that 15 minute job*. If there was anything information you felt you needed you could very easily have just emailed your question. Your actions do not feel like good faith.

> I reiterate my prior request for a call or a meeting so I can better understand and appreciate the situation. As Chief Restructuring Officer of NJ it is important I understand what disputes might be pending or ongoing with the Company's lender.

Again, Tim, the February 28, 2025 letter explains the facts and our concerns thoroughly. What else do you possibly need to know in order to do your job as CRO?

If there is anything, just ask it by email so I can address it for you.


Thank you,

Tim

---

**From:** Michael Kanovitz <mike@loevy.com>
**Sent:** Tuesday, March 4, 2025 9:34 AM
**To:** Tim Bossidy <tbossidy@justicecannabisco.com>
**Cc:** Jon Loevy <jon@loevy.com>
**Subject:** Re: ASAP items on your plate


Tim,

There's no "tone" other than frustration.

When I ask people to send me straightforward information and materials, I'm used to getting responses in an hour or two.

I am trying to move a lot of balls forward.

It adds difficulty if I have to chase people down for things I've already asked for.

I don't want to find time for a call right now when the things I'm asking for are straightforward documents and

information.

That will just add delay.

Send me what you have by 10, and if I think there is a need for a call I'll ping you.

Thanks,

Mike

On Tue, Mar 4, 2025 at 7:28 AM Tim Bossidy <tbossidy@justicecannabisco.com> wrote:

> Hi Mike –
>
> I was surprised by the tone of your emails and the urgent demands without further context. Could we please schedule a call or a Zoom today to discuss what is going on so I can be helpful to the Company?
>
> Thank you!
>
> Tim
>
> ---
>
> **From:** Michael Kanovitz <mike@loevy.com>
> **Sent:** Monday, March 3, 2025 8:24 PM
> **To:** Tim Bossidy <tbossidy@justicecannabisco.com>
> **Cc:** Jon Loevy <jon@loevy.com>
> **Subject:** ASAP items on your plate
>
> Tim,
>
> I did not hear back from you today on the two items I wrote you about.
>
> 1. My questions in the 11:57 a.m. email responding to you about the Preliminary NJ Budget for Discussion.
>
> 2. My 12:19 pm email "Copy of Communications".

I'm disappointed that you did not respond to me already today. I'm told that you emailed with others at the company this afternoon.

Please send the answers and documents in the 11:57 email and the accounts in the 12:19 email **no later than 10 central time tomorrow**. Do not delay waiting for an answer from Sierra on the forensics vendor. Just supplement with that information later if they have preference.

The company is in a very important battle with AFC where well over $170 million is at stake. You possess important evidence. Getting it from you ASAP is vital to company.

If you can send these things sooner than 10 a.m. tomorrow, please do (I'll be working tonight).

Thanks in advance for your prompt compliance.

Mike

--

_____

**Mike Kanovitz** (He/Him)

Office: (312) 243-5900
311 N Aberdeen St, Chicago, IL 60607

[www.loevy.com](www.loevy.com)

--

_____

**Mike Kanovitz** (He/Him)

Office: (312) 243-5900
311 N Aberdeen St, Chicago, IL 60607

[www.loevy.com](www.loevy.com)

--

_____

**Mike Kanovitz** (He/Him)



Office: (312) 243-5900
311 N Aberdeen St, Chicago, IL 60607

[www.loevy.com](www.loevy.com)